## UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
|  | : |  |
| **Marie Bolden** |  |  |
| 5606 Fargo Avenue | : |  |
| Oxon Hill, Maryland 20745 |  |  |
| plaintiff | : |  |
|  |  |  |
|  | : |  |
| **Derwin Patten** |  |  |
| 6505 Ronald Road | : |  |
| Capitol Heights, Maryland 20743 |  |  |
| plaintiff | : |  |
|  |  | Civil action _____ |
| and | : |  |
|  |  |  |
| **Roy Patten** | : |  |
| 104 Layton Court |  |  |
| Upper Marlboro, Maryland 20774 | : |  |
| plaintiff |  |  |
|  | : |  |
| v. |  |  |
|  | : |  |
| **District of Columbia Government** |  |  |
| 1350 Pennsylvania Avenue, N.W. | : |  |
| District of Columbia 20004 |  |  |
| defendant | : |  |

**COMPLAINT CHARGING ILLEGAL DISCRIMINATION
HARMFUL TO BLIND VENDORS DOING BUSINESS
IN DISTRICT OF COLUMBIA
Class Action Against Municipal Government**

This action charges the District of Columbia

government ("District of Columbia") with violating the

Americans with Disabilities Act of 1990 ("ADA"), the

Rehabilitation Act of 1973, and the Human Rights Act of

1977, and this action describes these statutory violations

as taking place during the course of a continuous and

uninterrupted pattern or scheme that lasted since at least October 1, 2010, if not earlier.  More specifically, this action arose from ongoing discrimination against local Randolph-Sheppard blind vendors, with that discrimination illegally taking advantage of the vendors' blindness.

The unlawful discrimination against local blind vendors affected the District of Columbia's regulation of Randolph-Sheppard vending facilities, especially with the following misconduct: (1) discriminatory inspections of blind vendors' facilities; (2) dissemination of small print government communications that blind vendors could not read; (3) failure to provide adequate auxiliary aids for blind vendors; and (4) cheating blind vendors with excessive or unauthorized deductions, set asides, and other such levies and expenses on vending machine operations.  In this lawsuit, the cause of action arose from the targeting of Randolph-Sheppard blind vendors on account of their blindness, and the plaintiffs challenge this discrimination by asserting their rights under the ADA, the Rehabilitation Act of 1973, and the Human Rights Act of 1977.  The plaintiffs also assert the civil rights of other Randolph-Sheppard blind vendors doing business in the District of Columbia.

### Jurisdiction

1. According to the mandate provided in **28 U.S.C., section 1331**, this court has jurisdiction to hear this matter.

2. The incidents described in this complaint happened in the District of Columbia.

### Identification of Parties

3. Ms. Marie Bolden, a plaintiff, lives and works as a blind person with total vision impairment.  Indeed, Ms. Bolden is blind according to the definitions in the **D.C. Code, section 7-1009(1),** and **20 U.S.C., section 107e(1).** Since about March 1, 1990, Marie Bolden served as one of the blind vendors employed in the District of Columbia's Randolph-Sheppard Vending Facility Program.  As part of the Randolph-Sheppard Vending Facility Program, Ms. Bolden operated a prime vending facility at the Government Accountability Office located at 441 G Street, N.W.  Until early 2018, Ms. Bolden also operated a satellite vending facility at the U.S. Department of Treasury located at 401 14th Street, N.W.

4. Mr. Derwin Patten, a plaintiff, lives and works as a blind person with substantial vision impairment.  Indeed, Mr. Patten is blind according to the definitions in the **D.C. Code, section 7-1009(1),** and **20 U.S.C., section**

**107e(1).**  Since about January 3, 1992, Derwin Patten served as one of the blind vendors employed in the District of Columbia's Randolph-Sheppard Vending Facility Program.  As part of the Randolph-Sheppard Vending Facility Program, Mr. Derwin Patten operated a prime vending facility at the Defense Intelligence Agency located at 200 MacDill Boulevard, Building 6000 D-2821, Joint Base Anacostia-Bolling ("DIA vending facility").

5. Mr. Roy Patten, a plaintiff, lives and works as a blind person with total vision impairment.  Indeed, Mr. Patten is blind according to the definitions in the **D.C. Code, section 7-1009(1),** and **20 U.S.C., section 107e(1).** Since about July 1, 1994, Roy Patten served as one of the blind vendors employed in the District of Columbia's Randolph-Sheppard Vending Facility Program.  As part of the Randolph-Sheppard Vending Facility Program, Mr. Roy Patten operated a prime vending facility at the U.S. Department of Labor located at 200 Constitution Avenue, N.W.

6. (a) The District of Columbia government, the defendant, functions as a municipal government in the capital of the United States.  As such, the District of Columbia, through its Department on Disability Services, Rehabilitation Services Administration ("DDS-RSA"), manages the Randolph-Sheppard Vending Facility Program and the

program's receipt of vending machine revenue from
government buildings within the nation's capital.  The
Randolph-Sheppard Vending Facility Program provides
opportunities for blind people to manage vending facilities
for profit in government buildings.

(b) Under the District of Columbia and its DDS-RSA,
the Randolph-Sheppard Vending Facility Program regulated
since October 1, 2010 the vending facilities and the
vending machines associated with about thirty blind
vendors, including the three plaintiffs.  Under this
arrangement, the District of Columbia, through its DDS-RSA,
managed the Randolph-Sheppard Vending Facility Program's
written communications to plaintiffs and to other class
members.  Similarly, the DDS-RSA determined whether, and to
what extent, plaintiffs and other class members could
receive municipally funded auxiliary aids for their
blindness.  During the relevant period, the DDS-RSA
purported under the District of Columbia Food Code ("Food
Code" and "**25 DCMR 4402 *et seq.***") to inspect under a regime
of illegal segregation the plaintiffs' and the other class
members' food selling vending facilities.

(c) In contrast, the District of Columbia, through its
Department of Health, exclusively regulated and inspected
sighted vendors' food selling vending facilities within the

nation's capital, and the Department of Health regulated these sighted vendors' food selling vending facilities under both the **D.C. Code, section 7-731(a)(5)** and **25 DCMR 4402 *et seq.*** Under the **D.C. Code, section 7-731(a)(5),** the Department of Health asserted exclusive authority for enforcing the Food Code as codified at **25 DCMR 4402 *et seq.***

### Class Action Allegations

7. (a) The plaintiffs intend to represent as a class about thirty blind vendors who, after September 30, 2010, operated Randolph-Sheppard vending facilities at some time or another in the District of Columbia.  The thirty or so blind vendors making up the class include about ten blind vendors who, because of death or retirement, no longer operate Randolph-Sheppard vending facilities.

(b) During the relevant period, the thirty or so blind vendors whom the plaintiffs would represent happened to be blind according to the definitions in the **D.C. Code, section 7-1009(1),** and **20 U.S.C., section 107e(1).**

(c) As required by **rule 23(a)(1)** of the **Federal Rules of Civil Procedure,** the class of blind vendors with current or former Randolph-Sheppard vending facilities in the District of Columbia would be so numerous that joinder of all class members would be impracticable.

(d) Also, as required by **rule 23(a)(2)-(3),** questions of law or fact are common to the class, and the claims asserted by the representative plaintiffs would be the same as the claims typically available to the class.

(e) Moreover, as required by **rule 23(a)(4),** the representative plaintiffs would fairly and adequately protect the interests of the class.

8. (a) In addition, **rule 23(b)(1)(B)** permits class certification because the prosecution of separate actions by individual class members would create the risk of adjudications which as a practical matter would be dispositive of the interests of other class members not bringing this lawsuit.

(b) In a related sense, **rule 23(b)(1)(A)** permits class certification because the prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the party opposing the class.

(c) Also, **rule 23(b)(2)** permits class certification because the District of Columbia acted or refused to act on grounds generally applicable to the class of blind vendors managed by the local Randolph-Sheppard Vending Facility Program.

(d) As a result, final injunctive relief and corresponding declaratory relief for the entire class would be appropriate.

9. (a) The plaintiffs would be adequate representatives of the class because they have no conflict of interests, either among themselves or with the class as a whole.

(b) Indeed, the plaintiffs, like the other class members, received from the District of Columbia government Randolph-Sheppard "food establishment inspection reports", a variety of Randolph-Sheppard financial reports, and other essential written communications and agreements, all in small print, that the plaintiffs, because of their blindness, could not read.

(c) The District of Columbia failed to provide to the plaintiffs and to other class members adequate accommodations or auxiliary aids so as to enable these blind individuals to be fully apprised of the detailed content of District of Columbia written communications and agreements in small print, including Randolph-Sheppard food establishment inspection reports and Randolph-Sheppard financial reports.

(d) The plaintiffs, like the other class members, endured inspections under an illegal regime that segregated

these blind vendors, with the inspections of blind vendors'
facilities being performed by inadequately trained DDS-RSA
disability monitors whose inspections differed
substantially and materially from lawful inspections by
Department of Health food inspectors who, under the **D.C.
Code, section 7-731(a)(5)** and **25 DCMR 4402 *et seq*.**,
inspected sighted vendors' facilities.

(e) Since at least October 1, 2010, the plaintiffs,
like the other class members, lost money to the District of
Columbia when the municipal government, under a regime of
illegal segregation of blind vendors, charged the
plaintiffs and other class members with unauthorized or
excessive vending machine deductions, set asides, and other
such levies and expenses.

(f) When the District of Columbia charged the
plaintiffs and other class members with unauthorized or
excessive vending machine deductions, set asides, and other
such levies and expenses, the District of Columbia took
possession of the deductions, set asides, and other such
levies and expenses and unjustly enriched itself to the
detriment of the plaintiffs and the other class members.

10. (a) Each class member, including the plaintiffs,
received from the District of Columbia hundreds of written
communications in small print, including Randolph-Sheppard

food establishment inspection reports, Randolph-Sheppard financial reports, and other essential communications and agreements about DDS-RSA services and blind vendors' obligations.  However, the plaintiffs and the other class members, because of their blindness, could not read these small print communications.

(b) During the relevant period, the DDS-RSA selected, designed, and produced the previously described written communications and agreements in a small print that could be read only by individuals with sighted vision.

(c) Although the DDS-RSA selected, designed, and produced in small print the food establishment inspection reports that the District of Columbia used for regulating the class members' vending facilities, the regulation at **25 DCMR 4403.1** mandated that the Department of Health, not the DDS-RSA, "shall designate the [standardized] form for each food establishment inspection" that would be conducted at a vending facility.

(d) Since at least October 1, 2010, the District of Columbia government, through its DDS-RSA, used hundreds, if not thousands, of written communications and agreements in small print as described in paragraphs 10(a)-(b) when the District of Columbia offered services, benefits, activities, legal protections, or other opportunities to

the plaintiffs or to other class members as part of the Randolph-Sheppard Vending Facility Program.

(e) Since at least October 1, 2010, the District of Columbia delivered its small print communications and agreements to the plaintiffs and to other class members by postal mail, by email, or by other means, but always without appropriate auxiliary aids for the blind.

11. (a) Since at least October 1, 2010, the District of Columbia refused or failed to provide the plaintiffs and the other class members with appropriate auxiliary aids, with which these blind vendors could read[1] DDS-RSA written communications and agreements as described in paragraphs 10(a)-(b).

(b) As a result, the plaintiffs and the other class members, because of their blindness, had trouble taking advantage of the services, benefits, activities, legal protections, and opportunities within the Randolph-Sheppard Vending Facility Program, that is, insofar as the written communications and agreements as described in paragraphs

---

[1] This term "read" means, with the use of competent auxiliary aids, the following: (1) a person with substantial vision impairment, but who happens not to be totally blind, reading a magnified version of a written communication; (2) a blind person listening to an automated device or a human reader when the device or the human reader reads aloud in verbatim fashion a written communication; (3) a blind person listening to an audio-recording that pronounces aloud and in verbatim fashion for the blind person the entire message conveyed in a written document; or (4) a blind person reading a Braille transcription of a written communication.

10(a)-(b) outlined services, benefits, activities, legal protections, and opportunities within the Randolph-Sheppard Vending Facility Program.

(c) Indeed, without the use of appropriate auxiliary aids, these blind vendors were sometimes denied these services, benefits, activities, legal protections, and opportunities.

(d) The District of Columbia refused or failed to make reasonable modifications in its rules, policies, and practices so as to ensure that the plaintiffs and the other class members obtained appropriate auxiliary aids for reading all District of Columbia written communications and agreements, and so as to ensure that the plaintiffs and the other class members took full advantage of the services, benefits, activities, legal protections, and opportunities within the Randolph-Sheppard Vending Facility Program.

12. (a) Since at least October 1, 2010, the District of Columbia, through inadequately trained DDS-RSA disability monitors, inspected plaintiffs' and other class members' vending facilities, and the DDS-RSA disability monitors inspected these vending facilities without the help or supervision of professionally trained Department of Health food inspectors.

(b) Since inadequately trained DDS-RSA disability monitors inspected plaintiffs' and other class members' vending facilities as described in paragraph 12(a), those plaintiffs and those other class members never benefited from the professional counseling as provided by Department of Health inspectors, all of whom routinely counseled sighted vendors about the need for mandated protections against food-borne ailments and other health hazards.

(c) For example, from June 21, 2016 through March 30, 2017, the DDS-RSA performed at least four inspections of plaintiff Derwin Patten's DIA vending facility.  Jelani Smith, the DDS-RSA disability monitor who inspected Patten's DIA vending facility, purported during his DDS-RSA inspections to enforce the Food Code.  However, Smith, like other DDS-RSA disability monitors, never benefited from the specialized education and training required of Department of Health food inspectors who enforced the Food Code at sighted vendors' food establishments.

(d) During Jelani Smith's inspections of Patten's DIA vending facility from June 2016 through March 2017, Smith failed to determine, among other essential concerns, whether alleged violations of the Food Code happened to be "critical" or "non-critical", and Smith also failed to determine, among other essential concerns, whether the

alleged violations proved to be a "high" risk, a "medium" risk, or a "low" risk for food borne ailments and other health hazards.

(e) Nevertheless, the District of Columbia, through Jelani Smith and his DDS-RSA food establishment inspection reports, alleged that plaintiff Derwin Patten's DIA vending facility violated the Food Code because of dust on a lottery machine, because of empty boxes in a storage room, because of small bits of paper on the floor, and because of an inadequate display of merchandise, all of which, according to the District of Columbia, warranted termination of plaintiff Derwin Patten's DIA vending facility.  However, these alleged violations never posed a threat of food borne ailments or of other health hazards.

(f) On the other hand, when, for example, on June 19, 2015 the District of Columbia enforced the Food Code at a food establishment that sighted vendors operated, the District of Columbia, through its Department of Health, treated the sighted vendors differently from the DDS-RSA treatment of Derwin Patten and other class members.

(g) In other words, when on June 19, 2015 the Department of Health inspected a sighted vendor's facility called the "DIA Cafeteria", the District of Columbia, through its Department of Health, identified a number of

Food Code violations, such as food handlers with unwashed hands, food handlers using dirty gloves, inadequate hand-washing sinks, unclean food-contact surfaces, mold accumulation in a freezer, unsanitary wiping cloths, failure to date food for disposal, and a general failure to protect food from pathogens, all of which, according to the Department of Health inspection, proved to be "critical" Food Code violations that posed a serious and documented risk of food borne ailments and other health hazards.

(h) Despite the serious risk of food borne ailments and other health hazards at the DIA Cafeteria, the District of Columbia, through its Department of Health food inspectors, counseled the DIA Cafeteria's sighted managers on how to correct the Food Code violations, so as to protect against food borne ailments and other health hazards, and also for the purpose of protecting against the closure of the DIA Cafeteria.  For years, the District of Columbia, through its Department of Health food inspectors, provided this service for sighted vendors, but not with DDS-RSA disability monitors for Randolph-Sheppard blind vendors.

(i) As a result of the District of Columbia's discriminatory inspection regime, plaintiff Derwin Patten, a blind vendor, faced a proposed termination of his DIA

vending facility while similarly situated sighted vendors received from the Department of Health professional counseling that protected their food establishments from closure.

(j) The District of Columbia refused to make reasonable modifications in its rules, policies, and practices so as to ensure that Department of Health food inspectors (not DDS-RSA disability monitors acting alone) inspected the plaintiffs' and the other class members' vending facilities while also providing plaintiffs and other class members with professional counseling about how to correct Food Code violations and thereby protect against food borne ailments and the closure of their vending facilities.

(k) As a result of the discriminatory inspections described in paragraphs 12(a)-(j), plaintiffs and the other class members labored under a badge of inferiority. That is to say, the class members suffered from the presumption that the inspection of blind vendors' facilities must be segregated in quality and in kind from the inspection of sighted vendors' facilities. As a result, plaintiffs and other class members laboring under this segregated regime did not receive the services afforded to sighted vendors

when the Department of Health inspected sighted vendors'
food establishments.

(l) Since at least October 1, 2010, the District of
Columbia concealed from the blind plaintiffs and the other
class members the discriminatory nature of the inspection
regime described in paragraphs 12(a)-(k).

13. (a) Since at least October 1, 2010, the District
of Columbia, as part of an illegal regime for segregating
blind vendors, charged class members, including plaintiffs,
with vending machine deductions, set asides, and other such
levies and expenses that the District of Columbia had no
right or authority to charge against the account of
plaintiffs and other class members.  The vending machines
on which the government charged these unwarranted or
excessive deductions, set asides, and other such levies and
expenses produced revenue for the plaintiffs and the other
class members.

(b) Since at least October 1, 2010, when the District
of Columbia charged plaintiffs and other class members with
unauthorized or excessive vending machine deductions, set
asides, and other such levies and expenses, the District of
Columbia used secret mathematical formulas and principles
for calculating some or all of the deductions, set asides,
and other such levies and expenses, and, while doing so,

the District of Columbia concealed from plaintiffs and the
other class members these mathematical formulas and
principles, and the District of Columbia also concealed
from plaintiffs and the other class members that the
defendant's use of secret mathematical formulas and
principles resulted in unauthorized or excessive
deductions, set asides, and other such levies and expenses
against the plaintiffs' and the other class members'
accounts.

(c) Since at least October 1, 2010, when the District
of Columbia charged plaintiffs and the other class members
with unauthorized or excessive deductions, set asides, and
other such levies and expenses, the District of Columbia
failed to reimburse plaintiffs and the other class members
for the unauthorized or excessive deductions, set asides,
and other such levies and expenses charged against their
accounts.

(d) When the District of Columbia charged plaintiffs
and the other class members with unauthorized or excessive
vending machine deductions, set asides, and other such
levies and expenses, and when the District of Columbia
failed to reimburse plaintiffs and the other class members
for the unauthorized amounts charged as vending machine
deductions, set asides, and other such levies and expenses,

the District of Columbia took advantage of the blindness afflicting plaintiffs and the other class members.  Indeed, the District of Columbia charged plaintiffs and the other class members with unauthorized or excessive deductions, set asides, and other such levies and expenses because, as blind people, the plaintiffs and the other class members would never likely detect this injustice.

(e) The District of Columbia refused to make reasonable modifications in its rules, policies, and practices so as to protect against unauthorized and excessive vending machine deductions, set asides, levies, and expenses being charged against the accounts of the plaintiffs and the other class members.

(f) By its actions as described in paragraphs 13(a)-(e), the District of Columbia established a constructive trust for the benefit of the plaintiffs and the other class members.

14. As described in this complaint, the District of Columbia's unlawful actions were intentional, willful, and in deliberate indifference to the plaintiffs' and the other class members' rights as provided for by the ADA, the Rehabilitation Act of 1973, and the Human Rights Act of 1977.

15. (a) The questions of law or fact common to class members predominate over any questions affecting individual class members.  Indeed, a class action would be superior to other available methods for the fair and efficient adjudication of this controversy regarding violations of the ADA, the Rehabilitation Act of 1973, and the Human Rights Act of 1977.

(b) The litigation of individual claims by class members, while dealing with common questions of law or fact, would depend on blind vendors literally seeing litigable issues that some or all of the class members may never detect because of their blindness.  In fact, the District of Columbia depends on the blindness of class members in order to maintain the discriminatory regime that this lawsuit challenges.

(c) Moreover, the litigation of individual claims by class members, albeit while dealing with common questions of law or fact, would require scrutiny by a large number of blind persons of thousands of pages of written documents of substantially similar content, including documents issued by the District of Columbia government over many years to at least thirty blind vendors.  The scrutiny of thousands of pages of documents by more than twenty blind litigants and by the personal representatives of other litigants

would be exceedingly difficult and time-consuming during evidentiary hearings, during motions practice, and during the trial of this lawsuit.  These difficulties would greatly interfere with joinder of each class member and, therefore, would make joinder impracticable.

(d) To date, the class members never litigated the factual and legal problems outlined in this complaint. However, each class member labored up to the present under the illegal and discriminatory regime described in this complaint.

(e) This lawsuit would establish a single forum where important questions of law and fact common to each class member would be adjudicated, and that forum, as a United States district court, would have the expertise for interpreting and applying the ADA, the Rehabilitation Act of 1973, and the substantially similar Human Rights Act of 1977.

**Count 1: Use of DDS-RSA Food Establishment Inspections in Violation of D.C. Code, section 7-731(a)(5) and (b), and in Violation of 25 DCMR 4402 *et seq.*, Discriminated Against Blind Vendors in Violation of the ADA**

16. This count incorporates by reference paragraphs 1 through 15.

17. (a) Under the **D.C. Code, section 7-731(a)(5),** the Department of Health, not the DDS-RSA, has "exclusive" authority to "regulate food service establishments",

including "food vendors" such as Randolph-Sheppard blind vendors, for the purpose of protecting the health and safety of patrons buying food in the District of Columbia.

(b) Under **25 DCMR 4402.1(a)**, Department of Health inspectors with "official credentials", not DDS-RSA employees, have authority "to determine if [a] food establishment [such as a Randolph-Sheppard vending facility] is in compliance with" the Food Code as codified at **25 DCMR 100 *et seq*.**

(c) Under **25 DCMR 4403.1**, the Department of Health, not the DDS-RSA, "shall designate the form" that shall be used "for each food establishment inspection".

(d) Under the **D.C. Code, section 7-731(b)**, the Department of Health, not the DDS-RSA, has "exclusive" authority to employ "inspection[s]" and other "enforcement functions" for the purpose of enforcing the Food Code.

(e) Despite the exclusive authority vested in the Department of Health under the **D.C. Code, section 7-731(b)** and **25 DCMR 4403.1**, the DDS-RSA manufactured a bogus food establishment inspection report form and used that form to inspect Randolph-Sheppard vending facilities so as to determine their compliance with the Food Code.  According to reasonable information and belief, the DDS-RSA, as a District of Columbia agency, manufactured and used bogus

inspection report forms since at least October 1, 2010, while unlawfully enforcing the Food Code at blind vendors' facilities.

(f) Since at least October 1, 2010, and according to reasonable information and belief, the DDS-RSA bogus inspection report forms claimed to apply to inspections of Randolph-Sheppard vending facilities "pursuant to Title 25 of the District of Columbia Municipal Regulations", that is, pursuant to the Food Code as codified at **25 DCMR 100 *et seq.***

(g) Since at least October 1, 2010, and according to reasonable information and belief, DDS-RSA employees used DDS-RSA bogus inspection report forms during inspections of Randolph-Sheppard vending facilities where DDS-RSA employees, without guidance or supervision from Department of Health inspectors, purported to enforce the Food Code as codified at **25 DCMR 100 *et seq.***

(h) According to reasonable information and belief, the DDS-RSA, with its employees and DDS-RSA bogus inspection report forms, purported to enforce the Food Code at the plaintiffs' vending facilities since at least October 1, 2010, while also doing the same at the class members' vending facilities.

18. (a) In contrast, sighted food vendors doing business in the District of Columbia benefited since at least October 1, 2010 from periodic inspections of their food establishments by Department of Health inspectors as required by the **D.C. Code, section 7-731(b),** and **25 DCMR 4402.1** *et seq.*

(b) In fact, Department of Health inspectors, as authorized by **25 DCMR 4403.1,** used Department of Health computerized inspection report forms for the purpose of periodically enforcing the Food Code at sighted vendors' food establishments.

(c) In this way, Department of Health inspectors, not DDS-RSA employees, used lawfully created Department of Health inspection report forms for periodic inspections of sighted vendors' food establishments.

19. (a) Since at least October 1, 2010, Department of Health inspectors periodically inspected sighted vendors' food establishments and, while doing so, identified Food Code violations at those establishments.  In addition, Department of Health inspectors periodically counseled sighted vendors whose establishments had been inspected about how to correct Food Code violations.

(b) Since at least October 1, 2010, this periodic inspection and counseling by Department of Health

24

inspectors protected thousands of patrons from food borne ailments and other health hazards associated with violations of the Food Code.

(c) Hence, sighted vendors periodically received Department of Health counseling that protected them from civil or criminal liability for Food Code violations.

20. (a) On the other hand, DDS-RSA inspections of Randolph-Sheppard vending facilities took place without assistance or supervision from Department of Health inspectors.

(b) As a consequence, DDS-RSA inspections of Randolph-Sheppard vending facilities took place without Department of Health inspectors providing periodic counseling to the plaintiffs and to other class members about how to correct Food Code violations and about how to avoid food borne ailments or other health hazards.

(c) Since at least October 1, 2010, Randolph-Sheppard blind vendors, such as the plaintiffs and practically all other class members, operated their vending facilities without the benefit of periodic Department of Health inspections.

(d) As a result of the discriminatory inspections described in this count, plaintiffs and other class members labored under a badge of inferiority.  That is to say,

these blind vendors suffered from the District of Columbia's presumption that inspections of blind vendors' facilities must be segregated in quality and in kind from the District of Columbia's inspections of sighted vendors' facilities.  As a consequence, plaintiffs and other class members never received on a collective basis the services and the benefits afforded to sighted vendors by Department of Health inspections.

21. According to the ADA as enacted in **42 U.S.C., section 12132**, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity".  **42 U.S.C., section 12132**.

22. According to federal regulations at **28 C.F.R. §35.130(b)(1)(vii)**, "a public entity, in providing any aid, benefit, or service, may not, … on the basis of disability, … limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service".  **28 C.F.R. §35.130(b)(1)(vii)**.

23. According to federal regulations at **28 C.F.R. §35.130(b)(3)(i)**, "a public entity … may not … utilize

criteria or methods of administration … that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability". **28 C.F.R. §35.130(b)(3)(i).**

24. The plaintiffs, as well as the members of the class, are "qualified individuals" under **42 U.S.C., sections 12102** and **12132.** That is to say, as blind individuals according to the **D.C. Code, section 7-1009(1),** and **20 U.S.C., section 107e(1),** the plaintiffs, as well as the class members, suffered during the relevant period from a physical impairment that substantially limited them in the major life activity of seeing.

25. (a) The disparate inspections as described in this count violated the ADA as enacted in **42 U.S.C., section 12132.**

(b) The disparate use of DDS-RSA food establishment inspection report forms at blind vendors' facilities violated the ADA as enacted in **42 U.S.C., section 12132.**

(c) The disparate use of DDS-RSA inspections of the plaintiffs' vending facilities without guidance and supervision from Department of Health food inspectors violated the ADA as enacted in **42 U.S.C., section 12132.**

(d) The disparate use of DDS-RSA inspections of the class members' vending facilities without guidance and

supervision from Department of Health food inspectors

violated the ADA as enacted in **42 U.S.C., section 12132.**

### Count 2: Use of DDS-RSA Food Establishment Inspections in Violation of D.C. Code, section 7-731(a)(5) and (b), and in Violation of 25 DCMR 4402 *et seq.*, Discriminated Against Blind Vendors in Violation of the Rehabilitation Act of 1973

26. This count incorporates by reference paragraphs 1

through 25.

27. According to the Rehabilitation Act of 1973 as

enacted in **29 U.S.C., section 794(a),** "no otherwise

qualified individual with a disability shall, solely by

reason of her or his disability, be excluded from the

participation in, be denied the benefits of, or be

subjected to discrimination under any program or activity

receiving Federal financial assistance". **29 U.S.C.,**

**section 794(a).**

28. Upon information and belief, the District of

Columbia, including its DDS-RSA, receives federal financial

assistance within the meaning of the Rehabilitation Act of

1973.

29. The plaintiffs, as well as the members of the

class, are "qualified individuals" under **42 U.S.C.,**

**sections 12102** and **12132,** as well as under **29 U.S.C.,**

**sections 705(20)(A)-(B)** and **794(a).** That is to say, as

blind individuals according to the **D.C. Code, section 7-**

**1009(1),** and **20 U.S.C., section 107e(1),** the plaintiffs, as

well as the class members, suffered during the relevant period from a physical impairment that substantially limited them in the major life activity of seeing.

30. (a) The disparate inspections as described in count 1 violated the Rehabilitation Act of 1973 as enacted in **29 U.S.C., section 794(a).**

(b) The disparate use of DDS-RSA food establishment inspection report forms as described in count 1 violated the Rehabilitation Act of 1973 as enacted in **29 U.S.C., section 794(a).**

(c) The disparate use of DDS-RSA inspections against the plaintiffs without guidance and supervision from Department of Health food inspectors violated the Rehabilitation Act of 1973 as enacted in **29 U.S.C., section 794(a).**

(d) The disparate use of DDS-RSA inspections against the class members without guidance and supervision from Department of Health food inspectors violated the Rehabilitation Act of 1973 as enacted in **29 U.S.C., section 794(a).**

**Count 3: Use of DDS-RSA Food Establishment Inspections in Violation of D.C. Code, section 7-731(a)(5) and (b), and in Violation of 25 DCMR 4402 *et seq*., Discriminated Against Blind Vendors in Violation of the Human Rights Act of 1973**

31. This count incorporates by reference paragraphs 1 through 30.

32. According to the Human Rights Act of 1977 as enacted in the **D.C. Code, section 2-1402.73**, "it shall be an unlawful discriminatory practice for a District [of Columbia] government agency or office to limit or refuse to provide any facility, service, program, or benefit to any individual on the basis of an individual's actual or perceived … disability".  **D.C. Code, section 2-1402.73.**

33. According to the Human Rights Act of 1977 as enacted in the **D.C. Code, section 2-1402.68**, "any practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice".  **D.C. Code, section 2-1402.68.**

34. According to the Human Rights Act of 1977 as enacted in the **D.C. Code, section 2-1402.01**, "every individual shall have an equal opportunity to participate fully in the economic, cultural, and intellectual life of the District [of Columbia] and to have an equal opportunity to participate in all aspects of life".  **D.C. Code, section 2-1402.01.**

35. According to the Human Rights Act of 1977 as enacted in the **D.C. Code, section 2-1401.01**, "it is the intent of the Council of the District of Columbia, in enacting this chapter, to secure an end in the District of

Columbia to discrimination for any reason other than that of individual merit, including, but not limited to, discrimination by reason of … disability …". **D.C. Code, section 2-1401.01.**

36. The plaintiffs, as well as the members of the class, are "qualified individuals" under **42 U.S.C., sections 12102** and **12132,** under **29 U.S.C., sections 705(20)(A)-(B)** and **794(a),** and under the **D.C. Code, section 2-1401.02(5A).** That is to say, as blind individuals according to the **D.C. Code, section 7-1009(1),** and **20 U.S.C., section 107e(1),** the plaintiffs, as well as the class members, suffered during the relevant period from a physical impairment that substantially limited them in the major life activity of seeing.

37. (a) The disparate inspections as described in count 1 violated the Human Rights Act of 1977 as enacted in the **D.C. Code, sections 2-1402.68** and **2-1402.73.**

(b) The disparate use of DDS-RSA food establishment inspection report forms as described in count 1 violated the Human Rights Act of 1977 as enacted in the **D.C. Code, sections 2-1402.68** and **2-1402.73.**

(c) The disparate use of DDS-RSA inspections of the plaintiffs' vending facilities without guidance and supervision from Department of Health food inspectors

violated the Human Rights Act of 1977 as enacted in the

**D.C. Code, sections 2-1402.68** and **2-1402.73.**

(d) The disparate use of DDS-RSA inspections of the
class members' vending facilities without guidance and
supervision from Department of Health food inspectors
violated the Human Rights Act of 1977 as enacted in the

**D.C. Code, sections 2-1402.68** and **2-1402.73.**

**Count 4: The District of Columbia's Failure, through Its DDS-RSA,
to Provide Adequate Accommodations or Auxiliary Aids
Discriminated Against Blind Vendors in Violation of the ADA**

38. This count incorporates by reference paragraphs 1
through 37.

39. Since at least October 1, 2010, the plaintiffs,
like the other class members, received from the District of
Columbia government and its DDS-RSA written communications
and agreements in small print that the plaintiffs, because
of their blindness, could not read.

40. The District of Columbia and its DDS-RSA failed
since at least October 1, 2010 to provide to the plaintiffs
and to other class members appropriate or sufficient
auxiliary aids so as to enable these blind persons to be
fully apprised of the detailed content of DDS-RSA written
communications and agreements, including such small print
communications as DDS-RSA food establishment inspection

reports and DDS-RSA financial reports about vending machine revenue, expenses, and income.

41. Since at least October 1, 2010, the District of Columbia knew about, or should have known about, the availability of such auxiliary aids as human readers and automated reading machines, both of which read aloud in the English language written communications like DDS-RSA food establishment inspection reports and DDS-RSA financial reports, such that totally blind individuals like plaintiffs Marie Bolden and Roy Patten may be fully, competently, and timely apprised of the content of these written communications.

42. Since at least October 1, 2010, the District of Columbia knew about, or should have known about, the availability of such auxiliary aids as modern electronic magnifiers like, for example, the Nordiceye Tempus HD Electronic Magnifier Model 350132.

43. Since at least October 1, 2010, the Nordiceye Tempus HD Electronic Magnifier Model 350132 adequately enlarged small print communications like food establishment inspection reports, so that blind people like plaintiff Derwin Patten who suffers from "low vision blindness" may be able to read food establishment inspection reports and other small print communications.

44. Since at least October 1, 2010, the Nordiceye Tempus HD Electronic Magnifier Model 350132 adequately enlarged small print communications like DDS-RSA financial reports about vending machine revenue, expenses, and income, so that blind people like plaintiff Derwin Patten who suffers from "low vision blindness" may be able to read DDS-RSA financial reports and other small print communications.

45. When the District of Columbia, through its DDS-RSA, delivered to the plaintiffs and to other class members written communications in small print about municipal policy or actions, such as DDS-RSA food establishment inspection reports and DDS-RSA financial reports about vending machine revenue, expenses, and income, the District of Columbia government failed to apprise the plaintiffs and the other class members of the content and the meaning of these writings that blind people could not read.

46. As a result, the plaintiffs and the other class members failed to become aware in a timely way of programs, activities, benefits, services, rights, and legal protections afforded to them by the District of Columbia government.

47. As a result, the plaintiffs and the other class members became excluded from District of Columbia programs,

activities, benefits, services, rights, and legal protections, including, for example, the exclusion of the plaintiffs and the other class members from protections against being charged unauthorized or excessive vending machine deductions, set asides, and other such levies and expenses, and including, as an additional example, the exclusion of the plaintiffs and the other class members from the benefits of Department of Health inspections.

48. The District of Columbia's dissemination to the plaintiffs and to other class members of local government notices, inspection report forms, financial reports, agreements, and other writings in small print as described in this count violated the ADA as enacted in **42 U.S.C., section 12132.**

49. The District of Columbia's failure to provide appropriate or sufficient auxiliary aids as described in this count violated the ADA as enacted in **42 U.S.C., section 12132.**

**Count 5: The District of Columbia's Failure, through Its DDS-RSA, to Provide Adequate Accommodations or Auxiliary Aids Discriminated Against Blind Vendors in Violation of the Rehabilitation Act of 1973**

50. This count incorporates by reference paragraphs 1 through 49.

51. The District of Columbia's dissemination to the plaintiffs and to other class members of local government

notices, inspection report forms, financial reports, agreements, and other writings in small print as described in count 4 violated the Rehabilitation Act of 1973 as enacted in **29 U.S.C., section 794(a).**

52. The District of Columbia's failure to provide the plaintiffs and the other class members with appropriate or sufficient auxiliary aids as described in count 4 violated the Rehabilitation Act of 1973 as enacted in **29 U.S.C., section 794(a).**

**Count 6: The District of Columbia's Failure, through Its DDS-RSA, to Provide Adequate Accommodations or Auxiliary Aids Discriminated Against Blind Vendors in Violation of the Human Rights Act of 1973**

53. This count incorporates by reference paragraphs 1 through 52.

54. The District of Columbia's dissemination to the plaintiffs and to other class members of local government notices, inspection report forms, financial reports, agreements, and other writings in small print as described in count 4 violated the Human Rights Act of 1977 as enacted in the **D.C. Code, sections 2-1402.68** and **2-1402.73.**

55. The District of Columbia's failure to provide the plaintiffs and the other class members with appropriate or sufficient auxiliary aids as described in count 4 violated the Human Rights Act of 1977 as enacted in the **D.C. Code, sections 2-1402.68** and **2-1402.73.**

**Count 7: The District of Columbia's Wrongful Taking, Unjust Enrichment, and Constructive Trust in the Form of Excessive or Unauthorized Charges for Vending Machine Deductions, Set Asides, and Other Such Levies and Expenses Violated the ADA**

56. This count incorporates by reference paragraphs 1 through 55.

57. Since at least October 1, 2010, and according to reasonable information and belief, the District of Columbia government, as part of a regime that illegally segregated blind vendors, charged unauthorized or excessive vending machine deductions, set asides, and other such levies and expenses against the accounts of the plaintiffs and the other class members during the course of their participation in the Randolph-Sheppard Vending Facility Program.

58. (a) Since at least October 1, 2010, the District of Columbia owed an obligation under **20 U.S.C., section 107d-3(b)(1),** to pay the plaintiffs and the other class members on an individual basis 30%, 50%, or 100% of the vending machine income from vending machines located in government buildings where, in the nation's capital, the plaintiffs or the other class members individually operated their vending facilities.

(b) In contrast, since at least October 1, 2010, and according to reasonable information and belief, the District of Columbia deducted so much of the vending

machine income owed individually to the plaintiffs and to other class members that, instead of paying 30%, 50%, or 100% of the vending machine income owed on an individual basis to plaintiffs and to other class members, the District of Columbia paid at the most 9% to 25% of the vending machine income on an individual basis to plaintiffs and to other class members.

(c) Similarly, since at least October 1, 2010, the District of Columbia owed an obligation under **20 U.S.C., section 107b(3),** to set aside from vending machine income only so much money as would be necessary and as would be used by the District of Columbia to pay for the following: (1) the maintenance and replacement of plaintiffs' and other class members' vending facility equipment; (2) the purchase of new vending facility equipment for plaintiffs and other class members; (3) third party management services for plaintiffs and other class members; (4) a fair minimum return to plaintiffs and other class members; and (5) the plaintiffs' and the other class members' retirement or pension funds.

(d) In contrast, since at least October 1, 2010, and according to reasonable information and belief, the District of Columbia set aside for itself far more vending machine income than the sum allowed by **20 U.S.C., section**

**107b(3),** including sums for refurbishing DDS-RSA facilities, sums for DDS-RSA moving expenses, sums for DDS-RSA architectural services, sums for DDS-RSA construction expenses, and sums for other DDS-RSA expenses that **20 U.S.C., section 107b(3),** never authorized or provided for.

59. While charging the plaintiffs and the other class members with unauthorized or excessive vending machine deductions, set asides, and other such levies or expenses as described in paragraphs 58(a)-(d), the District of Columbia relied on and took advantage of the plaintiffs' and the other class members' blindness, and the District of Columbia did so when it, through the DDS-RSA, issued to the plaintiffs and to other class members in small print cryptic and incomplete financial reports that vaguely listed some of the disbursements from vending machines, but that did so while concealing from the blind vendors unauthorized or excessive vending machine deductions, set asides, and other such levies and expenses as described in paragraphs 58(a)-(d).

60. (a) In other words, the District of Columbia disseminated to the plaintiffs and to the other class members financial information about vending machine transactions from which the plaintiffs and the other class members earned revenue and income, but, when the District

of Columbia disseminated this financial information, it did so in small print that the plaintiffs and the other class members, being blind, could not read.

(b) When the District of Columbia disseminated the financial information described in paragraph 60(a) in a small print that the blind plaintiffs and the other class members could not read, the District of Columbia concealed from plaintiffs and the other class members the municipal government's unauthorized and excessive deductions, set asides, and other such levies and expenses on vending machine income.

61. (a) In addition, the District of Columbia concealed from plaintiffs and the other class members the mathematical formulas or the systems and principles used to charge plaintiffs and other class members with excessive or unauthorized vending machine deductions, set asides, and other such levies and expenses as described in paragraphs 58(a)-(d).

(b) When the District of Columbia concealed from plaintiffs and the other class members the mathematical formulas or the systems and principles referred to in paragraph 61(a), the District of Columbia concealed from the plaintiffs and the other class members the municipal government's unauthorized and excessive deductions, set

asides, and other such levies and expenses on vending machine income.

62. By concealing the mathematical formulas or the systems and principles referred to in paragraph 61(a), and by disseminating financial information about vending machine operations in small print that the plaintiffs and other class members could not read, the District of Columbia took advantage of the plaintiffs' and the other class members' blindness so as to charge them with unauthorized or excessive deductions, set asides, and other such levies and expenses.

63. After charging plaintiffs and other class members with unauthorized or excessive vending machine deductions, set asides, and other such levies and expenses as described in paragraphs 58(a)-(d), the District of Columbia collected these deductions, set asides, and other such levies and expenses from the accounts of the plaintiffs and the other class members.

64. The District of Columbia took possession of the money gained by charging the plaintiffs and the other class members with unauthorized or excessive vending machine deductions, set asides, and other such levies and expenses as described in paragraphs 58(a)-(d), and the money that the District of Columbia took possession of in that fashion

unjustly enriched the District of Columbia at the expense of the plaintiffs and the other class members.

65. Hence, the District of Columbia established a constructive trust over the money gained by charging the plaintiffs and the other class members with unauthorized or excessive vending machine deductions, set asides, and other such levies and expenses, and this constructive trust shall operate for the benefit of the plaintiffs and the other class members.

66. As a result of the constructive trust described in paragraph (65), the District of Columbia owes an equitable duty to convey to the plaintiffs and to the other class members the unauthorized or excessive vending machine deductions, set asides, and other such levies and expenses described in paragraphs 58(a)-(d).

67. As an alternative, the District of Columbia established a resulting trust over the assets gained by charging the plaintiffs and the other class members with unauthorized or excessive vending machine deductions, set asides, and other such levies and expenses, and this resulting trust shall operate for the benefit of the plaintiffs and the other class members.

68. As a result of the resulting trust described in paragraph (67), the District of Columbia owes an equitable

duty to convey to the plaintiffs and to the other class members the unauthorized or excessive vending machine deductions, set asides, and other such levies and expenses described in paragraphs 58(a)-(d).

69. When the District of Columbia charged the plaintiffs and the other class members with unauthorized or excessive vending machine deductions, set asides, and other such levies and expenses, the District of Columbia discriminated against plaintiffs and the other class members on account of their blindness.

70. As a result, the plaintiffs and the other class members became partially excluded from, or suffered a partial denial of, District of Columbia municipal services and legal protections that managed the accounts of Randolph-Sheppard blind vendors so as to ensure the delivery to the blind vendors of their full and rightful income from vending machine revenue.

71. Since at least October 1, 2010, the District of Columbia's continuous and coordinated scheme or pattern for charging the plaintiffs and the other class members with unauthorized or excessive vending machine deductions, set asides, and other such levies and expenses violated the ADA as enacted in **42 U.S.C., section 12132.**

**Count 8: The District of Columbia's Wrongful Taking, Unjust
Enrichment, and Constructive Trust in the Form of Unauthorized
Charges for Vending Machine Deductions, Set Asides, and Other
Such Levies and Expenses Violated the Rehabilitation Act of 1973**

72. This count incorporates by reference paragraphs 1 through 71.

73. Since at least October 1, 2010, the District of Columbia's continuous and coordinated scheme or pattern for charging the plaintiffs and the other class members with unauthorized or excessive vending machine deductions, set asides, and other such levies and expenses as described in count 7 violated the Rehabilitation Act of 1973 as enacted in **29 U.S.C., section 794(a).**

**Count 9: The District of Columbia's Wrongful Taking, Unjust
Enrichment, and Constructive Trust in the Form of Unauthorized
Charges for Vending Machine Deductions, Set Asides, and Other
Such Levies and Expenses Violated the Human Rights Act of 1973**

74. This count incorporates by reference paragraphs 1 through 73.

75. Since at least October 1, 2010, the District of Columbia's continuous and coordinated scheme or pattern for charging the plaintiffs and the other class members with unauthorized or excessive vending machine deductions, set asides, and other such levies and expenses as described in count 7 violated the Human Rights Act of 1977 as enacted in the **D.C. Code, sections 2-1402.68** and **2-1402.73.**

**Count 10: The District of Columbia's Unauthorized Charges for Vending Machine Deductions, Set Asides, and Other Such Levies and Expenses Constituted an Unjust Enrichment of the District of Columbia**

76. This count incorporates by reference paragraphs 1 through 75.

77. The District of Columbia took possession of the money gained by charging the plaintiffs and the other class members for unauthorized or excessive deductions, set asides, and other such levies and expenses as described in count 7, and the money that the District of Columbia gained by charging for these unauthorized or excessive deductions, set asides, and other such levies and expenses unjustly enriched the District of Columbia at the expense of the plaintiffs and the other class members.

**Count 11: The District of Columbia's Unauthorized Charges for Vending Machine Deductions, Set Asides, and Other Such Levies and Expenses Constituted a Constructive Trust**

78. This count incorporates by reference paragraphs 1 through 77.

79. The District of Columbia government established a constructive trust over the money gained by charging the plaintiffs and the other class members for unauthorized or excessive vending machine deductions, set asides, and other such levies and expenses as described in count 7, and this constructive trust shall operate for the benefit of the plaintiffs and the other class members.

80. As a result of the constructive trust described in paragraph (79), the District of Columbia owes an equitable duty to convey to the plaintiffs and to the other class members the unauthorized or excessive vending machine deductions, set asides, and other such levies and expenses described in paragraphs 58(a)-(d).

**Count 12: The District of Columbia's Unauthorized Charges for Vending Machine Deductions, Set Asides, and Other Such Levies and Expenses Constituted a Resulting Trust**

81. This count incorporates by reference paragraphs 1 through 80.

82. As an alternative, the District of Columbia established a resulting trust over the money gained by charging the plaintiffs and the other class members for unauthorized or excessive vending machine deductions, set asides, and other such levies and expenses as described in count 7, and this resulting trust shall operate for the benefit of the plaintiffs and the other class members.

83. As a result of the resulting trust described in paragraph (82), the District of Columbia owes an equitable duty to convey to the plaintiffs and to the other class members the unauthorized or excessive vending machine deductions, set asides, and other such levies and expenses described in paragraphs 58(a)-(d).

WHEREFORE, the plaintiffs, that is, Marie Bolden, Derwin Patten, and Roy Patten, ask this court to do the following:

(a) declare that the defendant District of Columbia violated the ADA as enacted in **42 U.S.C., section 12132;**

(b) declare that the defendant District of Columbia violated the ADA as interpreted by **28 C.F.R. §35.130(b)(1)(vii);**

(c) declare that the defendant District of Columbia violated the ADA as interpreted by **28 C.F.R. §35.130(b)(3)(i);**

(d) declare that the defendant District of Columbia violated the Rehabilitation Act of 1973 as enacted in **29 U.S.C., section 794(a);**

(e) declare that the defendant District of Columbia violated the Human Rights Act of 1977 as enacted in the **D.C. Code, section 2-1402.73;**

(f) declare that the defendant District of Columbia violated the Human Rights Act of 1977 as enacted in the **D.C. Code, section 2-1402.68;**

(g) enjoin the defendant District of Columbia from using its DDS-RSA food establishment inspection report forms for the purpose of regulating, managing, or otherwise

dealing with the plaintiffs, the class members, or their
Randolph-Sheppard vending facilities;

(h) enjoin the defendant District of Columbia from
using its DDS-RSA employees, without guidance and
supervision from Department of Health food inspectors, for
the work of enforcing the Food Code as codified at **25 DCMR
100 *et seq.*;**

(i) enjoin the defendant District of Columbia from
employing a segregated, an isolated, or an otherwise
discriminatory inspection regime against the plaintiffs and
the other class members, especially for the purpose of
enforcing the Food Code as codified at **25 DCMR 100 *et seq.*;**

(j) enjoin the defendant District of Columbia from
issuing to the plaintiffs and to other class members
written communications in small print that the plaintiffs
and the other class members, being blind, cannot read;

(k) enjoin the defendant District of Columbia to
deliver immediately to the plaintiffs and to the other
class members appropriate auxiliary aids, such as human
readers, automated reading machines, modern electronic
magnifiers like the Nordiceye Tempus HD Electronic
Magnifier Model 350132, written communications in Braille,
and audio-recorded communications, so as to ensure that all
District of Columbia communications to the plaintiffs and

to other class members may be fully and competently understood by the plaintiffs and the other class members;

(l) enjoin the defendant District of Columbia from charging the plaintiffs and the other class members with excessive or unauthorized vending machine deductions, set asides, levies, and expenses;

(m) order the defendant District of Columbia to pay general and compensatory damages to the plaintiffs, that is, to Marie Bolden, Derwin Patten, and Roy Patten;

(n) order the defendant District of Columbia to pay general and compensatory damages to each member of the class;

(o) order the defendant District of Columbia to pay attorneys' fees; and

(p) grant other relief that the court believes to be appropriate.

## JURY TRIAL DEMAND

The plaintiffs demand a jury trial on the issues of

fact raised in this complaint.

Respectfully submitted,


   /s/ Thomas Ruffin, Jr.
Thomas Ruffin, Jr. #370817
RUFFIN LEGAL SERVICES
153 Galveston Place, S.W.
Suite 4
District of Columbia 20032
(202) 561-2898
iska999@yahoo.com